**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| VAN HORST GENERAL CONTRACTORS, LLC, on behalf of itself and other similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UNITED RENTALS, INC.; SUNBELT RENTALS, INC.; HERC RENTALS INC.; HERC HOLDINGS INC.; H&E EQUIPMENT SERVICES, INC.; SUNSTATE EQUIPMENT CO., LLC; RB GLOBAL, INC.; and ROUSE SERVICES LLC,<br><br>Defendants. | Case. No. ____________<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Van Horst General Contractors, LLC ("Plaintiff"), individually and on behalf of the Class defined below, brings this action against Defendants United Rentals, Inc. ("United Rentals"), Sunbelt Rentals, Inc. ("Sunbelt Rentals"), Herc Rentals, Inc. ("Herc Rentals"), Herc Holdings, Inc. ("Herc Holdings," together with Herc Rentals, the "Herc Defendants" or "Herc"), H&E Equipment Services, Inc. ("H&E"), Sunstate Equipment Co., LLC ("Sunstate," together with United Rentals, Sunbelt Rentals, the Herc Defendants, and H&E, the "Rental Company Defendants"), RB Global, Inc. ("RB Global"), and Rouse Services LLC ("Rouse Services," together with RB Global, the "Rouse Defendants") (collectively, "Defendants"), and alleges, upon personal knowledge as to itself and its own actions, and otherwise upon information and belief, including the investigation of counsel, as follows:

## I. NATURE OF THE ACTION

1. This class action arises from Defendants' unlawful agreement to raise, fix,

maintain, and/or stabilize the rental prices of "construction equipment,"[1] from one or more Rental Company Defendants from at least as early as March 31, 2021, and continuing through the present (the "Class Period"), the exact dates being unknown to Plaintiff.

2. To carry out their price-fixing conspiracy, Defendants exchanged competitively sensitive, non-public information concerning rental rates, fleet utilization data, and other commercially sensitive metrics related to construction equipment.

3. An agreement among horizontal competitors to share competitively sensitive, non-public information constitutes an unlawful information exchange in violation of Section 1 of the Sherman Act. The Rental Company Defendants' agreement to exchange confidential rental rates, fleet utilization data, and supply and demand information served as an effective mechanism for enforcing a broader price-fixing scheme.

4. The Rouse Defendants facilitated this scheme by providing the Rental Company Defendants with access to a benchmarking platform that collected and disseminated competitively sensitive data contributed by their clients, including the Rental Company Defendants. This platform generated daily benchmarking reports including rental rates, fleet utilization metrics, and other key performance indicators.

5. Pursuant to this arrangement, the Rental Company Defendants shared competitively sensitive information through the Rouse benchmarking platform—information they would not have disclosed absent a mutual agreement to do so.

6. The competitively sensitive information disseminated through the Rouse

[1] The term "construction equipment" as used herein refers to equipment tools, machinery, and large equipment—such as bulldozers, cranes, excavators, forklifts, generators, and trucks—used for construction projects such as constructing or demolishing buildings, maintaining industrial plants, or renovating homes.

Defendants' benchmarking platform was accessible only to subscribing construction equipment rental companies that contributed their own data. This information was not available to the public or non-subscribing competitors. By restricting access to contributing members, the platform enabled the Rental Company Defendants to regularly monitor competitors' pricing and utilization trends, thereby facilitating coordination and enforcement of supracompetitive pricing.

7. Just as antitrust law prohibits direct exchanges of competitively sensitive information among competitors aimed at stabilizing or controlling prices, it likewise forbids such exchanges through intermediaries. The Rental Company Defendants cannot evade liability under the Sherman Act by outsourcing their information exchange to a third party.

8. Sharing such competitively sensitive information was contrary to the unilateral self-interest of each Rental Company Defendant. The reciprocal and coordinated nature of the exchange reassured each participant that its rivals would also adhere to the conspiracy. This pervasive information sharing functioned as a critical mechanism for monitoring and enforcing cartel discipline.

9. Beyond the improper information exchange, other "plus factors" further support the existence of a price-fixing conspiracy: the construction equipment rental market is highly concentrated, features high barriers to entry, exhibits inelastic demand, and provided numerous opportunities for collusion, including meetings at trade associations. Thus, the structure of the industry made it particularly susceptible to coordinated conduct.

10. As a result of the alleged conspiracy, the Rental Company Defendants have been able to raise their prices for construction equipment rentals year after year, collecting ever increasing profits. The Rouse Defendants, in turn, now have more than 400 construction equipment rental clients as subscribers to their benchmarking platform.

11. Plaintiff paid higher prices to rent construction equipment from one or more of the Rental Company Defendants during the Class Period than it would have paid in a competitive market absent the unlawful conspiracy and the conduct alleged herein.

## II. PARTIES

### A. Plaintiff

12. Plaintiff Van Horst General Contractors, LLC is a construction contracting company with operations in Connecticut and Florida. During the Class Period, Plaintiff rented construction equipment on multiple occasions from one or more Rental Company Defendants at prices artificially inflated by one or more of the Rental Company Defendants or their co-conspirators as a result of the anticompetitive conduct alleged herein.

### B. Defendants

#### 1. The Rental Company Defendants

13. Defendant United Rentals, Inc. ("United Rentals") is a corporation incorporated in Delaware with its principal place of business located at 100 First Stamford Place, Suite 700, Stamford, Connecticut 06902. United Rentals is the largest construction equipment rental company in the world.

14. Defendant Sunbelt Rentals, Inc. ("Sunbelt Rentals") is a corporation incorporated in North Carolina with its principal place of business located at 1799 Innovation Point, Fort Mill, North Carolina 29715. Sunbelt Rentals is the second-largest equipment rental company in the United States.

15. Sunbelt Rentals is a division of Ashtead Group PLC, a public limited company headquartered at 100 Cheapside, London EC2V 6DT, United Kingdom. Ashtead Group PLC is publicly traded on the London Stock Exchange and operates under the brand name "Sunbelt Rentals" in the United States, Canada, and the United Kingdom. Through its U.S. operations,

Ashtead Group PLC rents construction equipment to customers nationwide across a variety of industries.

16. Defendants Herc Rentals Inc. ("Herc Rentals") and Herc Holdings Inc. ("Herc Holdings" and together with Herc Rentals, the "Herc Defendants" or "Herc") are corporations incorporated under the laws of Delaware, with their principal place of business located at 27500 Riverview Center Boulevard, Bonita Springs, Florida 34134. Both companies are publicly traded, and Herc Rentals is primarily engaged in the business of renting construction and industrial equipment.

17. Defendant H&E Equipment Services, Inc. ("H&E") is a publicly traded corporation incorporated in Delaware with its principal place of business located at 7500 Pecue Lane, Baton Rouge, Louisiana 70809. H&E operates a rental fleet that includes aerial work platforms, earthmoving equipment, material handling equipment, and other general and specialty machinery.

18. Defendant Sunstate Equipment Co., LLC ("Sunstate") is a limited liability company incorporated in Delaware with its principal place of business located at 5552 E. Washington Street, Phoenix, Arizona 85034. Sunstate is one of the largest construction equipment rental companies in the United States, operating approximately 100 branches across 16 states. Sunstate is a wholly owned subsidiary of Sumitomo Corporation Group ("Sumitomo"), a global trading and investment enterprise headquartered in Japan. Sumitomo is publicly traded on the Tokyo Stock Exchange and is also listed through an American Depositary Receipt on the New York Stock Exchange.

**2. The Rouse Defendants**

19. Defendant RB Global, Inc. ("RB Global") is a publicly traded corporation listed on both the Toronto Stock Exchange and the New York Stock Exchange. It is legally domiciled in Canada and maintains its U.S. headquarters at 2 Westbrook Corporate Center, Suite 1000,

Westchester, Illinois 60154. RB Global is a global marketplace for industrial equipment, vehicles, and other assets, including heavy equipment used in the construction sector. RB Global wholly owns Co-Defendant Rouse Services LLC, which it acquired in 2020 for $275 million.

20. Defendant Rouse Services LLC ("Rouse" or "Rouse Services") is a wholly owned subsidiary of RB Global, Inc. and its principal place of business is located at 8383 Wilshire Boulevard, Suite 9001, Beverly Hills, California 90210. Rouse provides benchmarking, analytics, and market intelligence services to the equipment rental industry.

## III. JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a); Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26; and Section 1 of the Sherman Act, 15 U.S.C. § 1.

22. Venue is proper in this District under 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b)–(d), because, during the Class Period, one or more Defendants resided or transacted business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this district.

23. This Court has personal jurisdiction over each Defendant because each Defendant transacted business, maintained substantial contacts, and is located and/or committed unlawful conduct in this District. Defendants' unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

24. Defendants' activities were within the flow of, were intended to, and did have a substantial effect on interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

# IV. FACTUAL ALLEGATIONS

## A. The Market for Construction Equipment Rentals

25. The U.S. construction equipment rental industry serves a wide range of sectors, including commercial and residential construction, infrastructure development, industrial maintenance, and energy. Contractors and project managers rely on rental agreements to meet project-specific equipment needs while avoiding the substantial capital investment, maintenance costs, and storage challenges associated with ownership.

26. "Construction equipment," as the term is used in the rental industry, includes a broad array of heavy machinery and tools such as aerial work platforms, excavators, bulldozers, cranes, skid steers, compactors, trench safety systems, forklifts, and generators. This equipment is essential to core construction activities including site preparation, lifting, hauling, grading, and structural assembly.

27. Construction equipment is expensive to purchase and maintain and therefore requires logistical coordination and technical oversight to deploy efficiently. Renting allows customers to access a diverse inventory of specialized machinery on a short- or medium-term basis, enabling them to scale their fleets in line with project scope, geographic needs, and seasonal fluctuations, while preserving working capital.

28. The U.S. equipment rental industry generated an estimated $83.7 billion in revenue in 2024 and is projected to grow by an additional 5.2% in 2025, reaching $87.5 billion, according to the American Rental Association ("ARA").[2]

29. Construction equipment rental is a commoditized service with limited product

[2] "ARA's latest US and Canada economic forecast released at The ARA Show," ARA Rental Management (Jan. 2025), https://news.ararental.org/aras-latest-us-and-canada-economic-forecast-released-at-the-ara-show.

differentiation. Comparable equipment models are available from multiple manufacturers, and customers typically make rental decisions based on price, availability, and geographic proximity rather than brand or provider loyalty. As a result, competition in this market is primarily price-driven.

**B. The Rental Company Defendants' Market Power**

30. The U.S. construction equipment rental market is highly concentrated, with the Rental Company Defendants controlling a substantial share of rental revenue and fleet capacity. United Rentals holds the industry's largest fleet, and a significant percentage of the North American market share.[3] Sunbelt, the second largest, operates over 1,200 locations with annual revenues exceeding $8 billion.[4] Herc, H&E, and Sunstate all ranked within the RER Top 10 for 2024.[5] This concentrated market structure gives these firms significant influence over pricing and supply.

31. These firms have expanded their dominance through aggressive acquisition strategies. United Rentals and Herc Rentals have repeatedly acquired competitors to eliminate mid-sized rivals and expand market coverage. In 2025, United Rentals announced a $4.8 billion acquisition of H&E Equipment Services, adding 160 branches across more than 30 states.[6] The result is a market with fewer competitors, higher barriers to entry, and reduced customer choice.

32. Their market power is reflected in consistently high revenues and margins. United

---

[3] KHL Group, "Top 15 US-Based Rental Companies," International Rental News (June 2024), https://www.khl.com/news/leading-the-world-in-growth-top-15-us-based-rental-companies/8032165.article.

[4] *Id.*

[5] "The New RER 100 Tops $35 Billion," Rental Equipment Register (May 2023), https://www.rermag.com/home/article/21265904/the-new-rer-100-tops-35-billion.

[6] "Stamford-Based Fortune 500 Company United Rentals to Acquire Louisiana-Based Firm in $4.8B Deal," CT Insider (Jan. 2025), https://www.ctinsider.com/business/article/ct-unitedrentals-h-e-equipment-4-8b-20033822.php.

and Herc reported record financials in 2023 and 2024, and significant total revenue increases year over year.[7] These results underscore the firms' ability to raise or maintain pricing without losing share and are consistent with market power.

33. Large contractors often prefer renting from firms with predictable service, logistics capabilities, and diverse fleets. These advantages are not easily replicable by smaller providers, insulating the largest firms from competitive pressure.

### C. Defendants Unlawfully Raised, Fixed, Maintained, or Stabilized Prices of Construction Equipment Rentals in the United States.

#### 1. The Rouse Defendants Facilitated Coordinated Pricing

34. Following steep declines in rental revenue and pricing during the 2008 financial crisis, major players in the construction equipment rental industry sought ways to stabilize rates and avoid further losses. From 2008 to 2010, leading rental firms, such as United Rentals, experienced substantial revenue reductions, widespread branch closures, and diminished profitability.[8]

35. In response to these pressures, Rouse Services launched a benchmarking program in January 2011 that would become known as Rouse Rental Insights ("RRI"). The platform was explicitly designed to address what Rouse and market participants viewed as a lack of transparency in regional pricing behavior. By centralizing data from competing firms, Rouse promised to offer insight into prevailing market rates, rental patterns, and asset utilization.

36. To encourage adoption and data contribution, Rouse initially offered the benchmarking service for free. Participants received monthly summary reports comparing their

---

[7] "Herc, United Post Record Revenues in Q1," Equipment Finance News, (Apr. 2024), https://equipmentfinancenews.com/news/rentals/herc-united-post-record-revenues-in-q1/.
[8] "Under Pressure," Rental Equipment Register (Feb. 2009), https://www.rermag.com/business-technology/business-info-analysis/article/20937175/under-pressure.

rental rates, dollar utilization, and time utilization against anonymized industry averages in their regions. These summary-level comparisons were available at no cost, provided the participant submitted its own data to Rouse.

37. This no-cost, data-in-exchange-for-benchmark model was widely publicized in trade media and industry press releases. For example, Rental Equipment Register reported in 2012 that Rouse's analytics platform delivered valuable market comparisons to participants and explicitly stated that "a substantial amount of information is provided for free, simply in exchange for supplying Rouse with the data, which remains confidential."[9]

38. Rouse's free-entry model quickly attracted participation from the industry's largest rental companies. Founding members included Defendants United Rentals, Herc, and H&E, who allowed Rouse to collect and analyze their competitively sensitive data through the platform—laying the groundwork for the Rouse cartel.

**2. Rouse Metrics are Calculated Using Competitively Sensitive Information**

39. The Rouse platform's value—and its anticompetitive potential—derives from the type of data Rouse collects from participants. Participating rental companies submit detailed, transaction-level rental invoice data on a nightly basis, including the make and model of the equipment rented, the rental rate charged, the location of the rental, the start and end dates of the rental, and other relevant transaction details.

40. In addition to invoice data, participants provide fleet snapshots, including asset-level data on time utilization (i.e., hours or days a unit was rented), dollar utilization (i.e., revenue

---

[9] "Rouse Asset Services Offers Rental Metrics Benchmark Service," Rental Equipment Register (Oct. 2012), https://www.rermag.com/business-technology/business-info-analysis/article/20938084/rouse-asset-services-offers-rental-metrics-benchmark-service.

generated per asset), and other operational metrics.[10]

41. From these exchanges of the Rental Company Defendants' and other rental companies' competitively sensitive information, the Rouse platform was able to create and provide participants with a collective "RRI Price."

42. Rouse calculates the RRI Price by applying a proprietary formula that draws on the clients' pooled competitively sensitive data, along with Rouse's own assessment of seasonality and market conditions. Rouse then provides users with the same RRI Prices—by category and class of equipment—specific to the local market.

43. These benchmarks are not historical or general industry averages. Rather, the benchmarks provide near-real-time insights reflecting the precise pricing and utilization behavior of competitors in a given geographic area.[11] Since the underlying data includes confidential, non-public pricing and operations information, the resulting benchmarks offered unmatched insight into rivals' current pricing strategies.

44. As new data is received, Rouse continuously updates the RRI Prices. Customers receive a High, Medium, and Low RRI Price for each equipment type, along with a comparison of their own rates against those benchmarks.

45. Participants then used this information to assess where their pricing fell in comparison to competitors. A rental company charging below the RRI Price for a specific type of equipment in a particular city, for example, could raise its prices without fear of being undercut, confident that the benchmark reflected what its competitors were charging.

[10] Rouse Services, "Rental Insights," https://www.rouseservices.com/solutions/rental-insights/.
[11] "Rouse Analytics Rental Benchmark Service Tops 50 Participants," Rental Equipment Register (Feb. 2015), https://www.rermag.com/news-analysis/headline-news/article/20950099/rouse-analytics-rental-benchmark-service-tops-50-participants.

46. In other words, the Rental Company Defendants were able to use the RRI Price to coordinate and implement their price fixing scheme.

### 3. The Rental Company Defendants are Encouraged to Set Rental Prices using the RRI Price

47. The Rouse platform enabled the seamless and automatic exchange of competitively sensitive information among its clients, including the Rental Company Defendants, by integrating directly with their rental management software systems.

48. Defendants configured their rental platforms to export invoice-level rental transaction data to Rouse on a nightly or regular basis. This data included billed rental rates, physical and dollar utilization, and fleet age.

49. Rouse standardized, anonymized, and aggregated this data to generate benchmark metrics, including the RRI Price, which reflected average rental rates for specific equipment categories and regions across all participating companies.

50. The RRI Price and related benchmark metrics were relayed from Rouse's platforms to the Rental Company Defendants through integrated dashboards and API connections embedded in their software systems, enabling the companies to access these competitive insights directly from within their own software.

51. The integration of Rouse's benchmarking tools into the Defendants' rental software allowed the Rental Company Defendants to continuously and passively monitor competitors' pricing behavior through the RRI Price and other metrics.

52. Rouse further enforces adherence to the RRI Price by regularly advising and training its clients on how to use its metrics to maximize prices. Rouse has also implemented features within the software itself that promote compliance with its benchmarks, such as self-populating fields, alerts, and an interface designed to discourage downward deviations from the

RRI Price.

53. Rouse's benchmarks have become so widely adopted that they have effectively replaced independent price setting. Instead of competing on price, firms align their rates at or above the RRI Price, leading to inflated, uniform pricing and a reduction in price competition. This practice has become embedded in company strategy, with RRI benchmarks used not only by field sales teams to set daily rental quotes but also by senior management to guide corporate pricing policy.

54. The Rental Company Defendants understood that their competitors were also contributing competitively sensitive information to Rouse, and that Rouse was collecting and redistributing that data to participating firms. The Defendants relied on this shared information to coordinate rental price increases above competitive levels.

55. It would not have been in any individual Rental Company Defendant's economic interest to allow Rouse to collect and distribute its proprietary pricing and utilization data in the absence of collusion. Their participation only made sense if they expected to gain access to their competitors' sensitive data and to use that data to inform their own pricing decisions.

**4. Market Participants Credit Rouse with Enabling Price Increases**

56. Trade publications and industry insiders have acknowledged the central role that RRI has played in standardizing pricing across the industry.

57. In an investigative report published in December 2024, The Capitol Forum quoted a rental executive stating that "Rouse has essentially standardized a lot of the price competition in the industry. Since their involvement, rates have significantly increased. . . . If you're a mid-size

or larger company, you're using Rouse."[12]

58. This statement illustrates how industry participants viewed Rouse not merely as a data aggregator, but as a mechanism for aligning market behavior and limiting price competition. The remarks also underscore the widespread adoption of Rouse's benchmarking services and the correlation between Rouse's proliferation and sustained increases in rental rates.

59. In a May 2023 presentation at a Goldman Sachs Industrials Conference, the Chief Financial Officer of Herc Rentals, Mark Humphrey, highlighted the role of Rouse's benchmarking platform in sustaining pricing discipline across the rental market: "You have sort of 50% to 60% of North American rental companies reporting into Rouse… That certainly goes to the discipline in the overall marketplace in the industry … I think it's invaluable."[13]

60. These statements reflect an understanding that, by providing insight into the pricing behavior of competitors and normalizing rental rates across firms, Rouse's platform has provided participants the ability to raise prices without fear of being undercut.

61. At the same event, Herc CEO Larry Silber emphasized that Herc and other firms were able to implement and maintain price increases without resistance from customers, stating: "The market is accepting the price increases that are being put forth … we haven't had any real significant pushback at all."[14]

62. The statements from Herc executives and other industry insiders demonstrate that participants relied on Rouse's benchmarking tools not only to monitor market conditions, but to enforce price discipline and ensure that firms charged similar rates and avoided competitive

---

[12] "RB Global's Rouse Services Could Face Antitrust Scrutiny Over Information Sharing," The Capitol Forum (Dec. 23, 2024), https://thecapitolforum.com/rb-globals-rouse-services-could-face-antitrust-scrutiny-over-information-sharing.

[13] *Id.*

[14] *Id.*

discounting.

63. These admissions are consistent with the economic effects observed throughout the industry following Rouse's expansion: rising prices, increasing margins, and a marked reduction in price variability.

### 5. Industry Consolidation Amplified the Anticompetitive Effects of RRI

64. The domestic market for construction equipment rentals has gone through significant consolidation in recent years, helping to facilitate cartel conduct and amplifying the anticompetitive effects of the Rental Company Defendants' reliance on the Rouse platform and RRI Price.

65. Beginning in the early 2010s, United Rentals and other large firms embarked on an aggressive series of mergers and acquisitions. In 2017, United Rentals acquired NES Rental Holdings II, Inc. for $965 million,[15] followed by Neff Corporation for $1.3 billion later that year.[16] At the time, both NES and Neff ranked among the ten largest rental companies in the United States and were original participants in the Rouse benchmarking service. In 2018, United Rentals acquired BlueLine Rental for $2.1 billion, further consolidating its position in the national rental market.[17] In 2021, United Rentals acquired Franklin Equipment, LLC, a Midwest-based rental company with multiple locations, enhancing its regional footprint.[18] In 2022, United Rentals

---

[15] "United Rentals to Acquire Aerial Specialist Rental Company NES Rentals," Rental Equipment Register (Jan. 25, 2017), https://www.rermag.com/news-analysis/headline-news/article/20951740/united-rentals-to-acquire-aerial-specialist-rental-company-nes-rentals.

[16] "United Rentals to Acquire Neff Rental in $1.3 Billion Deal", Rental Equipment Register (Aug. 16, 2017), https://www.rermag.com/news-analysis/headline-news/article/20952206/united-rentals-to-acquire-neff-rental-in-13-billion-deal.

[17] "United Rentals to Acquire BlueLine Rental for $2.1 Billion," United Rentals Press Release (Sept. 10, 2018), https://www.unitedrentals.com/our-company/press-room/press-releases/detail/united-rentals-acquire-blueline-rental-21-billion.

[18] "United Rentals Acquires Franklin Equipment," United Rentals Press Release (Apr. 14, 2021), https://www.unitedrentals.com/our-company/press-room/press-releases/detail/united-rentals-acquires-franklin-equipment.

acquired Ahern Rentals, Inc. for $2 billion. The transaction added approximately 2,100 employees, 60,000 rental assets, and 106 U.S. locations to United Rentals' operations.[19] In 2025, United Rentals initiated, but ultimately withdrew from, an effort to acquire Defendant H&E.[20]

66. In 2025, Herc Rentals announced a $5.3 billion acquisition of H&E, outbidding United and significantly increasing its national presence.[21]

67. As a result of these mergers, a small group of firms control the majority of construction equipment rental assets in the United States. According to IBISWorld, United Rentals held the largest percentage of the total U.S. equipment rental market, with Sunbelt comprising a significant additional share.[22]

68. This consolidation facilitated the adoption of RRI across an increasingly centralized industry. By 2023, nine of the ten largest rental firms in North America were submitting data to Rouse and receiving its benchmark reports.[23]

69. Since leading firms, including the Rental Company Defendants, were submitting their pricing data to Rouse, and then setting their own prices based on Rouse's benchmarks, consolidation effectively institutionalized shared pricing behavior across the industry. Local and

[19] "United Rentals Completes Acquisition of Ahern Rentals," United Rentals Press Release (Dec. 7, 2022), https://investors.unitedrentals.com/press-releases/press-releases-details/2022/United-Rentals-Completes-Acquisition-of-Ahern-Rentals/default.aspx.

[20] "United Rentals, Inc. Will No Longer Pursue the Acquisition of H&E Equipment Services, Inc.," United Rentals Press Release (Feb. 18, 2025), https://investor-relations.unitedrentals.com/press-releases/press-releases-details/2025/United-Rentals-Inc.-Will-No-Longer-Pursue-the-Acquisition-of-HE-Equipment-Services-Inc/default.aspx.

[21] "Herc's Surprise Bid for H&E Makes Rival United Rentals Walk Away," Reuters (February 18, 2025), https://www.reuters.com/markets/deals/he-equipment-accepts-herc-rentals-53-billion-buyout-bid-ft-reports-2025-02-18/.

[22] Heavy Equipment Rental in the US – Market Research Report, IBISWorld (2024), https://www.ibisworld.com/united-states/industry/heavy-equipment-rental/1378.

[23] "RB Global's Rouse Services Could Face Antitrust Scrutiny Over Information Sharing," The Capitol Forum (Dec. 23, 2024), https://thecapitolforum.com/rb-globals-rouse-services-could-face-antitrust-scrutiny-over-information-sharing.

regional firms that also relied on Rouse were pulled into this pricing regime, further extending its reach.

70. Ultimately, the combination of increasing industry consolidation and near-universal reliance on RRI created an environment in which price competition was suppressed, price increases were reinforced, and the market became effectively cartelized through algorithmic benchmarking.

### 6. Pricing Outcomes Following Rouse Adoption and Industry Consolidation

71. Following the launch and widespread adoption of RRI, the construction equipment rental industry experienced sustained and substantial rental rate increases across a wide range of equipment categories. These increases occurred even in periods of flat or declining utilization, suggesting that price growth was not driven by natural market forces, such as increased demand.

72. According to industry research firm Arizton, the U.S. construction equipment rental market is expected to grow from $39.2 billion in 2022 to a projected $54.2 billion by 2029, reflecting a compound annual growth rate (CAGR) of 4.73%.[24] While overall construction activity is contributing to this growth, rental firms' pricing strategies—facilitated by shared benchmarks and consolidated market power—has played, and will continue to play, a central role in driving higher revenues.

73. In the U.S. market, rental rate increases outpaced inflation in multiple consecutive years during the 2020s. According to United Rentals' 2022 and 2023 investor reports, the company achieved annual rental rate increases, even as competitive conditions remained stable and fleet utilization fluctuated. Herc Rentals and Sunbelt Rentals similarly reported sustained annual price increases during this period.

[24] *Id.*

74. These coordinated price increases were not isolated to a few firms or categories. According to Equipment Watch, rental rates increased across nearly all equipment classes, including earthmoving, aerial, and material handling equipment, with some categories posting rate hikes exceeding double digit percentages.[25]

75. Because Rouse benchmarks provided localized pricing comparisons, firms were able to increase rates in tandem with their immediate competitors, thus ensuring that pricing discipline was maintained across geographic markets and customer segments. The result was an industry-wide reduction in price variance, higher average rates, and a growing revenue base untethered from meaningful competitive risk.

76. These pricing outcomes directly followed and correlated with Rouse's expansion from a handful of early adopters in 2011 to hundreds of participating firms by the early 2020s. As the benchmark became more granular and more universally relied upon, pricing behavior became more uniform and more detached from traditional market competition.

**D. Additional Plus Factors Support the Existence of a Conspiracy**

77. The construction equipment rental industry exhibits structural characteristics that economists and courts have long recognized as conducive to collusion. These characteristics include a concentrated market, homogenous products, high barriers to entry, inelastic customer demand, and price transparency among competitors—all of which increase the likelihood of successful coordination.

78. First, the industry is highly concentrated, especially at the national level. A handful of firms, including the Rental Company Defendants, control a dominant share of the U.S.

[25] "Equipment Rental Rates Rising – Some Dramatically, EquipmentWatch Reports," Equipment World (May 16, 2025), https://www.equipmentworld.com/business/equipment-rental/article/15744905/equipment-rental-rates-rising-equipmentwatch-reports.

equipment rental market.[26] These firms regularly compete in the same geographic regions, serve overlapping customer bases, and offer similar types of equipment.

79. Second, the industry features homogeneous or substitutable products, such as aerial lifts, earthmoving equipment, and generators. These products are typically rented based on make, model, and application, and customers view equipment from different suppliers as interchangeable. Homogeneity reduces the risk that firms can compete on product differences, making pricing the main source of competition.

80. Third, the industry is characterized by inelastic and time-sensitive customer demand, especially in commercial construction, where delays caused by equipment unavailability can have costly downstream effects. As a result, customers are often willing to accept higher rental rates rather than delay a project to seek lower prices elsewhere, giving rental firms greater leverage.

81. Fourth, the market presents high barriers to entry and expansion, including capital requirements to build and maintain large rental fleets, the need for extensive branch networks, and access to telematics and pricing tools like RRI. These barriers deter new entrants from undercutting incumbents on price or rapidly scaling into new regions.

82. Fifth, the pricing model of the industry lends itself to collusion. Rental prices are often set by sales staff based on rate sheets, customer relationships, and deal history. The widespread use of Rouse benchmarks, including the RRI Price, provides sales teams a centralized "going rate," which facilitates internal discipline and discourages deviation from consensus pricing levels.

83. Sixth, the Rouse platform itself provides price transparency among competitors.

---

[26] Heavy Equipment Rental in the US – Market Research Report, IBISWorld (2024), https://www.ibisworld.com/united-states/industry/heavy-equipment-rental/1378.

Participants receive detailed information about pricing and utilization patterns in their local markets, which is derived from their competitors' confidential transaction data. This created a classic environment for "tacit collusion," in which competitors could observe each other's behavior and align their own prices accordingly, even without direct communication.

84. As courts have noted, the presence of plus factors—such as industry concentration, price transparency, and evidence of parallel conduct in a conducive market—can support the inference of a price-fixing agreement under Section 1 of the Sherman Act. These plus factors are present here.

85. The structure of the construction equipment rental market, combined with the widespread adoption of Rouse's data-sharing platform, allowed dominant firms to achieve effective price coordination without the need for a written agreement or overt exchange of assurances. Through Rouse, they shared competitively sensitive information and maintained price increases, which are hallmarks of a functioning cartel.

**E. Defendants' Information Exchange is an Independent Violation of Section 1 of the Sherman Act**

86. Competition is harmed when, as here, competitors with market power in a concentrated market exchange confidential information about prices and supply. Information exchanges advance competitors' ability to collude.

87. The Supreme Court has long held that exchanges of competitive information among competitors may independently violate Section 1, even without an express agreement to fix prices. "Exchanges of current price information . . . have the greatest potential for generating anti-competitive effects and ... have consistently been held to violate the Sherman Act." *United States v. U.S. Gypsum Co.,* 438 U.S. 422, 441 n.16 (1978); *see also Todd v. Exxon,* 275 F.3d 191, 211 (2d Cir. 2001) (same). "By the same reasoning, exchanges of future price information are

considered especially anticompetitive." *Todd,* 275 F.3d at 211. "Genuine competitors do not make daily, weekly, and monthly reports of the minutest details of their business to their rivals ...." *American Column & Lumber Co. v. United States,* 257 U.S. 377, 410 (1921); *see also United States v. Container Corp. of Am.,* 393 U.S. 333, 336–38 (1969) (information exchange of price data among competitors unlawful despite absence of agreement to adhere to a price schedule where the exchange had an anticompetitive effect in the industry).

88. The Second Circuit has explained, "'[a] number of factors including most prominently the structure of the industry involved and the nature of the information exchanged are generally considered in divining the procompetitive or anticompetitive effects of this type of interseller communication.'" *Todd,* 275 F.3d at 199 (2d Cir. 2001) (quoting *Gypsum,* 438 U.S. at 441 n.16). "[E]xchanges of current price information have the greatest potential of creating anticompetitive effects and have consistently been held to violate the Sherman Act."[27]

89. The DOJ has stated that information exchanges with direct competitors raise serious antitrust concerns:

> [T]he sharing of information related to a market in which ... the participants are actual or potential competitors may increase the likelihood of collusion on matters such as price, output, or other competitively sensitive variables. The competitive concern depends on the nature of the information shared. Other things being equal, the sharing of information relating to price, output, costs, or strategic planning is more likely to raise competitive concern than the sharing of information relating to less competitively sensitive information.[28]

90. The DOJ has recently demonstrated a renewed focus on anticompetitive information sharing. On February 3, 2023, the DOJ withdrew antitrust policy statements that

---

[27] *In re SSA Bonds Antitrust Litig.,* No. 16 Civ. 3711 (ER), 2020 WL 1445783, at *4 (S.D.N.Y. Mar. 25, 2020) (citing *Gypsum,* 438 U.S. at 441 n.16).

[28] Fed. Trade Comm'n & U.S. Dep't of Just., Antitrust Guidelines for Collaborations Among Competitors (Apr. 2000), https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf.

provided safe harbors for sharing pricing or cost information, concluding that the policy statements were "*overly permissive* on certain subjects, *such as information sharing,* and no longer serve[d] their intended purposes of providing encompassing guidance to the public on relevant healthcare competition issues in today's environment." In December 2023, the Federal Trade Commission and DOJ jointly withdrew the Antitrust Guidelines for Collaboration Among Competitors and explained that "[t]he Agencies are committed to vigorous antitrust enforcement on a case-by-case basis in the area of competitor collaborations because such collaborations can harm competition and subvert the competitive process."[29]

91. Here, Defendants' information exchange existed for the purpose of coordinating and increasing construction equipment rental rates above competitive levels and aiding the Rental Company Defendants in abusing their market power to suppress price competition.

92. Further, as alleged above, Defendants' information exchange occurred in a market with characteristics that make it particularly likely that such an exchange will have anticompetitive effects, including markets with inelastic demand and fungible products, for which competition is largely price-based.

93. As a result, as alleged above, rental prices for construction equipment rose significantly during the Class Period.

94. There is no legitimate procompetitive justification for Defendants' conduct.

95. The Rental Company Defendants have caused direct anticompetitive effects in the form of higher prices to construction equipment renters and general contractors, such as Plaintiff.

[29] Justice Department and Federal Trade Commission Withdraw Guidelines for Collaboration Among Competitors, https://www.justice.gov/atr/media/1380001/dl?inline.

### F. Defendants' Anticompetitive Conduct Proximately Caused Plaintiff and Class Members to Suffer Antitrust Injury and Damages

96. Because of the Defendants' anticompetitive conduct: (1) competition in the construction equipment rental market has been reduced or eliminated, (2) prices for renting construction equipment have been maintained at supracompetitive levels, and (3) Plaintiff and those similarly situated have been deprived of the benefit of price competition.

97. As a result of the Defendants' anticompetitive conduct, Plaintiff and Class Members paid more for construction equipment rentals than they otherwise would have paid and thus suffered antitrust injury and damages.

## V. CLASS ALLEGATIONS

98. Plaintiff brings this action on behalf of itself, and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representative of the Class, which is defined as follows:

> All persons and entities in the United States and its territories that rented construction equipment from Defendants, or from a division, subsidiary, predecessor, agent, or affiliate of such rental company, at any time during the period of March 31, 2021, until the Defendants' unlawful conduct and its anticompetitive effects cease to persist.

99. The Class definition provides clear, objective criteria understood by Class Members and Defendants, and it allows the parties to identify the members of the Class.

100. Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed.

101. **Numerosity.** The Class is so numerous that joinder of all members in this action is impracticable. Plaintiff is informed and believes, and on that basis alleges, that the proposed Class contain tens of thousands of similarly situated proposed Class members. The Class members are readily identifiable and are ones for which records should exist.

102. **Typicality.** Plaintiff's claims are typical of those of the Class. Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the Class, and the relief sought is common to the Class.

103. Plaintiff and all members of the Class were all injured by the same unlawful conduct, which resulted in all of them paying more to rent construction equipment than they otherwise would have in a competitive market.

104. **Adequacy.** Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are not antagonistic to the Class. Plaintiff is willing and able to assume the duties of a class representative to protect the interests of all Class members. In addition, Plaintiff's counsel have significant experience successfully prosecuting complex antitrust class actions and possesses the necessary resources to vigorously litigate the case on behalf of the Class.

105. **Common Questions of Law and Fact Predominate.** Questions of law and fact common to the members of the Class will predominate over questions, if any, that may be specific to individual Class members, because the Defendants have acted and refused to act on grounds generally applicable to the Class.

106. Questions of law and fact common to the Class include:

a. Whether Defendants entered into a formal or informal contract, combination, conspiracy, or common understanding to fix, inflate, maintain or stabilize the price of construction equipment rentals from competitive levels;

b. Whether such agreement constituted violations of the Sherman Antitrust Act;

c. If Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct has in fact

artificially inflated the price of construction equipment rentals from competitive levels;

d. The proper measure of damages; and

e. The contours of appropriate injunctive relief to remediate the anticompetitive effects of the challenged conduct in the future.

107. Plaintiff is represented by counsel who are experienced in the prosecution of complex antitrust and unfair competition class actions.

108. **Superiority.** Class action treatment is the superior method for the fair and efficient adjudication of the controversy because, among other reasons, it will permit a large number of similarly situated people or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

109. **Injunctive Relief.** Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## VI. CLAIMS FOR RELIEF

### COUNT I:
### PRICE FIXING
### Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)
### (On Behalf of Plaintiff and Class Members)

110. Plaintiff incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

111. Beginning at a time currently unknown to Plaintiff, but at least as early as March

31, 2021, and continuing through the present, Defendants entered into and engaged in an unlawful contract, combination, or conspiracy, in restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

112. The unlawful contract, combination, or conspiracy consisted of an agreement among Defendants to fix, raise, stabilize, and/or maintain rental prices for construction equipment at artificially inflated levels. The agreement was intended to and did unreasonably restrain trade and suppress competition with the purpose and effect of artificially raising, fixing, maintaining, or stabilizing prices in the construction equipment rental market in the United States.

113. Defendants' conduct in furtherance of the unlawful scheme described herein was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' affairs.

114. This conduct constitutes a *per se* violation of Section 1 of the Sherman Act. In the alternative, Defendants' conduct is unlawful under either a "quick look" or full rule of reason analysis, as the agreement is inherently anticompetitive and lacks any plausible procompetitive justification. To the extent Defendants assert any such justification, it could have been achieved through significantly less restrictive means.

115. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will continue to suffer injury in the form of overcharges for construction equipment rentals.

116. Plaintiff and Class Members are entitled to treble damages, reasonable attorneys' fees and costs, and injunctive relief to end the ongoing antitrust violations described herein.

**COUNT II:**
**UNLAWFUL INFORMATION EXCHANGE**
**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**
**(On Behalf of Plaintiff and Class Members)**

117. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

118. Beginning at a time currently unknown to Plaintiff, but at least as early as March 31, 2021, and continuing through the present, Defendants entered into and engaged in an unlawful contract, combination, or conspiracy, in restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

119. The unlawful contract, combination, or conspiracy consisted of the regular and systematic exchange of competitively sensitive information between and among Defendants through the Rouse Defendants' RRI platform.

120. Defendants' conduct in furtherance of the unlawful information exchange described herein was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' affairs.

121. This conduct constitutes a *per se* violation of Section 1 of the Sherman Act. In the alternative, Defendants' conduct is unlawful under either a "quick look" or full rule of reason analysis, as the exchange of competitively sensitive information is inherently anticompetitive and lacks any plausible procompetitive justification. To the extent Defendants assert any such justification, it could have been achieved through significantly less restrictive means.

122. As a direct and proximate result of Defendants' unlawful information exchange, Plaintiff and Class Members have suffered and will continue to suffer injury in the form of overcharges for construction equipment rentals.

123. Plaintiff and Class Members are entitled to treble damages, reasonable attorneys'

fees and costs, and injunctive relief to end the ongoing antitrust violations described herein.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the proposed Class, respectfully requests judgment against Defendants, as follows:

A. That the unlawful contract, combination, or conspiracy alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act;

B. That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the contract, combination, or conspiracy alleged herein, or from entering into any other contract, combination, or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

C. That Plaintiff and the Class recover their costs of suit, including reasonable attorneys' fees, expenses, and costs as provided by law; and

D. That Plaintiff and the Class be awarded such other and further relief as the case may require and the Court may deem just and proper.

## VIII. JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff requests a trial by jury on all issues so triable.

Dated: July 29, 2025

Respectfully submitted,

*/s/ Jonathan M. Shapiro*
**AETON LAW PARTNERS LLP**
Jonathan M. Shapiro
311 Centerpoint Drive
Middletown, Connecticut 06475
Telephone: (860) 724-2160
jms@aetonlaw.com

*/s/ Kimberly A. Justice*
**FREED KANNER LONDON & MILLEN LLC**
Kimberly A. Justice *(pro hac vice forthcoming)*
923 Fayette Street
Conshohocken, PA 19428
Telephone: (610)234-6486
kjustice@fklmlaw.com

**FREED KANNER LONDON & MILLEN LLC**
Douglas A. Millen *(pro hac vice forthcoming)*
Samantha M. Gupta *(pro hac vice forthcoming)*
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
dmillen@fklmlaw.com
sgupta@fklmlaw.com

*Counsel for Plaintiff and the Proposed Class*